**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**JUDITH A. RAITE,**

                      **Plaintiff,**                    **5:07-cv-679
                                                              (GLS)**

              v.

**MICHAEL J. ASTRUE,** Commissioner
of Social Security,

                      **Defendant.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Satter, Andrews Law Firm | ROSS P. ANDREWS, ESQ. |
| 217 South Salina Street, 6th Floor | |
| Syracuse, NY 13202 | |
| | |
| **FOR THE DEFENDANT:** | |
| HON. RICHARD S. HARTUNIAN | SHEENA V. WILLIAMS-BARR |
| United States Attorney | Special Assistant U.S. Attorney |
| 445 Broadway | |
| James T. Foley U.S. Courthouse | |
| Albany, NY 12207-2924 | |
| | |
| MARY ANN SLOAN | |
| Regional Chief Counsel | |
| Social Security Administration | |
| Office of General Counsel, Region II | |
| 26 Federal Plaza, Room 3904 | |
| New York, NY 10278 | |

**Gary L. Sharpe
District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

## I. Introduction

Plaintiff Judith Raite challenges the Commissioner of Social Security's denial of disability insurance benefits (DIB), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering the arguments, the court affirms the Commissioner's decision and dismisses Raite's complaint.

## II. Background

On April 29, 2005, Raite filed an application for DIB under the Social Security Act, alleging disability beginning on January 1, 1999, due to relapsing-remitting multiple sclerosis (MS) and related fatigue. (Tr.[1] at 69-73; *see also* Tr. at 24.) After her application was denied, Raite requested a hearing before an Administrative Law Judge (ALJ), which was held on January 31, 2007. (Tr. at 228-64.) On March 14, 2007, the ALJ issued a decision denying the requested benefits, (Tr. at 22-31), which became the Commissioner's final decision upon the Social Security Administration Appeals Council's denial of review. (Tr. at 4-6.)

---

[1] "(Tr. )" refers to the page of the administrative transcript in this case.

2

Raite commenced the present action by filing a complaint on June 27, 2007, seeking review of the Commissioner's determination. (Dkt. No. 1.) The Commissioner filed an answer and a certified copy of the administrative transcript. (Dkt. Nos. 5, 6.) Each party, seeking judgment on the pleadings, filed a brief. (Dkt. Nos. 7, 10; *see also* Dkt. No. 15.)

### III. Contentions

Raite contends that the Commissioner's decision is not supported by substantial evidence or the appropriate legal standards. Specifically, Raite claims that the ALJ: (1) failed to follow the treating physician rule; (2) improperly relied on the opinion of a non-medical source; and (3) selectively cited to the record and ignored evidence supporting her claim. (*See* Pl. Br. at 6-15, Dkt. No. 7.) The Commissioner counters that substantial evidence supports the ALJ's decision.

### IV. Facts

The evidence in this case is undisputed and the court adopts the parties' factual recitations. (*See* Pl. Br. at 1-5, Dkt. No. 7; Def. Br. at 2, Dkt. No. 10.)

### V. Standard of Review

The standard for reviewing the Commissioner's final decision under

3

42 U.S.C. § 405(g) is well established and will not be repeated here. For a full discussion of the standard and the five-step process used by the Commissioner in evaluating whether a claimant is disabled under the Act, the court refers the parties to its previous opinion in *Christiana v. Comm'r Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

## VI. Discussion

Generally, the opinion of a treating physician is given controlling weight if it is based on well-supported, medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998). Furthermore, "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (citations omitted). An ALJ may not arbitrarily substitute his own judgment for a competent medical opinion. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Where controlling weight is not given to the treating physician's

opinion, the ALJ must assess several factors to determine how much weight to give the opinion, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination by the treating physician for the conditions in question; (3) the medical evidence and explanations provided in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the qualifications of the treating physician; and (6) other relevant factors tending to support or contradict the opinion.  *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

The "ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the Commissioner."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  "[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions ...."  *Snell*, 177 F.3d at 133.   Where the evidence of record includes medical source opinions that are inconsistent with other evidence or are internally inconsistent, the ALJ must weigh all of the evidence and make a disability determination based on the totality of that evidence.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the period of eligibility for Raite was from January 1, 1999, to

December 31, 2003.  (*See* Pl. Br. at 2 n.1, Dkt. No. 7.)  On November 10, 2004, Raite met for the first time with Dr. Cornelia Mihai for a neurologic evaluation.  (Tr. at 156-58.)  After noting Raite's complaints of fatigue, Dr. Mihai detailed the results of her physical and neurological examinations.  (Tr. at 156-57.)  The physical examination was "unremarkable."  (Tr. at 157.)  As to Raite's neurological status, Dr. Mihai found her alert and fully oriented, with clear and fluent speech; average visual acuity with glasses; a mild temporal pallor in her left eye; decreased bilateral hearing; no sensory loss at the face level; excellent muscle tone bulk and strength; minimally-decreased vibration in her feet; minimal decrease in hand coordination; and a stable gait and unimpeded ability to walk on her toes, heels, and in tandem.  (Tr. at 157-58.)  After comparing a brain magnetic resonance imaging (MRI) from September 23, 1992, with a brain MRI from September 9, 2002, and finding signs of progression and the appearance of multiple white matter lesions or plaques, Dr. Mihai diagnosed Raite with relapsing-remitting MS—a diagnosis that was consistent with Raite's previous neurologist, Dr. Ernest Nitka.  (Tr. at 158.)  Based on her diagnosis, Dr. Mihai advised Raite to have new brain and cervical-spine MRIs taken, to return in six months for review, and to continue taking Rebif to slow the

6

progression of MS, decrease the number and severity of acute attacks, and prevent the accumulation of additional plaques.  (*Id.*)

Dr. Mihai performed a follow-up examination of Raite on May 12, 2005.  (Tr. at 153.)  Dr. Mihai again noted that Raite complained about "continuing to have significant fatigue which may fluctuate in intensity and at times interferes with her daily activities." (*Id.*)  However, Dr. Mihai also noted that Raite reported "no new MS symptoms or acute attacks." (*Id.*) Dr. Mihai's physical and neurological findings were nearly identical to her November 10, 2004 findings.  And although a new brain MRI done on May 11, 2005, revealed a "couple of new lesions," Dr. Mihai opined that "none of these lesions enhance with contrast or have a clinical correlate."  (Tr. at 154.)  Accordingly, Dr. Mihai recommended that Raite continue taking Rebif, "which appears to be well tolerated and hopefully will keep the disease under control," start taking amantadine for fatigue control, and exercise regularly to improve her endurance and energy level.  (*Id.*)

In a series of subsequent follow-up examinations that took place in December 2005, May 2006, and September 2006, Dr. Mihai found that Raite's relapsing-remitting MS "appears stable on clinical grounds."  (Tr. at 214, 216, 219.)  While Dr. Mihai continued to note Raite's complaints of

7

fatigue, (Tr. at 213, 215), Dr. Mihai ultimately found in September 2006 that Raite's fatigue was "constant and disabling," (Tr. at 219). However, Dr. Mihai continuously stressed that Raite was not engaging in a non-fatiguing exercise program or physical therapy as recommended. (Tr. at 213, 214, 215, 216, 218, 219.) Furthermore, Dr. Mihai repeatedly noted that despite the success the prescribed medications were having on her fatigue, Raite "elected not to take them." (Tr. at 213, 215, 219.)

In a sworn affidavit dated January 30, 2007, Dr. Mihai outlined her treatment of Raite. (Tr. at 225-227.) Based on her treatment of Raite and review of Raite's pre-2004 medical records, Dr. Mihai stated that: "[t]he medical records demonstrate ... that [Raite's] fatigue has persisted since prior to her [MS] diagnosis"; "Raite's condition has grown progressively worse"; and "[Raite] has continued to suffer from extreme fatigue and has experienced additional exacerbations of her MS symptoms." (Tr. at 226.) Dr. Mihai further opined that over the course of her treatment, she has found that Raite's fatigue has increased to the point that it "prevents her from engaging in routine activities of daily living," would prevent her from engaging in sustained regular employment, and is "subject to exacerbation by both stress and exposure to extreme heat." (Tr. at 227.) And according

8

to Dr. Mihai, since "even a low stress workplace would likely exacerbate her symptoms," Raite is "totally and permanently disabled from any gainful employment" and "would be unable to perform even sedentary, part-time work on any regular basis." (*Id.*)

Upon review of the ALJ's decision, the medical and non-medical evidence, and Raite's own testimony and submissions, it is clear that the ALJ accorded appropriate weight to Dr. Mihai's opinion. Contrary to Raite's contention that the ALJ gave Dr. Mihai's opinion limited weight due to its retrospectiveness, the ALJ limited the weight given to Dr. Mihai's opinion because Dr. Mihai's opinion is minimally retrospective, does not conclusively support a finding of disabled, and is contradicted by the other medical and non-medical evidence on record.

Dr. Mihai's opinion and treatment notes primarily focus on Raite's condition between 2004 and 2007, and not on the relevant period of eligibility. Dr. Mihai's retrospective opinion is largely limited to her review of MRIs taken in 1992, 1999, and 2002, from which she was able to diagnose Raite with relapsing-remitting MS based on the gradual accumulation of white matter lesions. However, aside from reporting Raite's contemporaneous complaints and reiterating earlier physicians' treatment

9

records, Dr. Mihai offers no opinions germane to Raite's condition or symptoms during the eligibility period. Instead, Dr. Mihai's conclusions focus on Raite's present and future condition as of 2007. Thus, as the Commissioner points out, Dr. Mihai does not explicitly or implicitly offer an opinion regarding whether Raite was disabled prior to December 31, 2003. (*See* Def. Br. at 7, Dkt. No. 10.) Accordingly, the ALJ concluded that "[w]hile [Dr. Mihai's findings] may be true now, the record does not show that this was the case prior to [Raite's] date last insured." (Tr. at 29.) Moreover, it was reasonable for the ALJ to infer from Dr. Mihai's notes and impressions regarding progression that Raite's condition had significantly worsened from 2003 to 2007, when Dr. Mihai finally concluded that Raite's fatigue had reached a disabling level.[2]

Equally important, Dr. Mihai's finding of disability is not consistent with the remainder of the medical record. Neurologist Dr. Ernest Nitka treated Raite from 1999 to 2003. (Tr. 139-48.) Prior to seeing Dr. Nitka, Raite had experienced two isolated incidents of blurred vision, one in 1992 and one in 1994, which prompted her then treating physicians to perform

---

[2] The same inference could be drawn from Raite's testimony, which suggests that, by January 31, 2007, over four years after the date last insured, her condition had significantly worsened. (Tr. at 241, 250-51, 256-57.)

10

an MRI and CT scan.  (Tr. at 148.)  Her first episode of blurred vision, which her neurologist, Dr. Lewis Robinson, attributed to stress, and her second episode, which was accompanied by some fatigue, "eventually cleared up." (*Id.*)  In 1999, prior to meeting with Dr. Nitka, Raite experienced some numbness and tingling on the left side of her face, which was "treated as Bell's palsy with steroids and she improved." (*Id.*)  Then, after experiencing blurred vision and undergoing an MRI, Raite met with Dr. Nitka on March 5, 1999.  (*Id.*)

   Upon his initial examination,  Dr. Nitka's findings regarding Raite's physical and neurological status generally paralleled those of Dr. Mihai. (*Id.*)  And like Dr. Mihai, Dr. Nitka found that the 1999 MRI, when compared to the 1992 MRI, revealed that several white matter lesions had formed in MS-specific areas of Raite's brain.  (*Id.*)  Accordingly, Dr. Nitka diagnosed Raite as having MS.  (*Id.*)  Dr. Nitka further opined that if the 1992 episode represented an MS attack, then Raite "has had MS for at least 7 years and when everything is considered she is doing relatively well."  (Tr. at 147.)

   Dr. Nitka treated Raite regularly from March 1999 to November 2003. However, his treatment notes from that period reference Raite's fatigue symptomatology only three times.  Moreover, each reference is made

11

largely in passing, with fatigue being mentioned either as a symptom of bronchitis, fever, or a viral infection, or as a result of her physical activity. (Tr. at 143, 145, 147.) By September 6, 2002, which was the last time Dr. Nitka noted Raite's fatigue, Dr. Nitka "would [still] not ... begin to think about treating her problem as an MS flare up or as fatigue syndrome of MS without first making sure that other causes have been looked into." (Tr. at 142.) And from November 2002 to October 2003, Dr. Nitka reported that Raite was "otherwise doing well," that her MS was stable, and that there were "[n]o complaints" and "no sign of breakthrough attacks." (Tr. at 140-41.)

Seeking a second opinion, Dr. Nitka referred Raite to Dr. Steven Schwid on September 17, 2002. (Tr. at 141.) In addition to making the same physical findings as both Drs. Nitka and Mihai, Dr. Schwid's evaluation of Raite's MS closely tracks Dr. Nitka's findings. (Tr. at 149-50.) And like Dr. Nitka, after surveying Raite's 1992, 1994, and 1999 episodes and assessing her 2001 and 2002 MRIs, Dr. Schwid confirmed Dr. Nitka's diagnosis of relapsing-remitting MS, noting that the "overall lesion burden was relatively mild" and that her ongoing disease activity was "fairly mild." (Tr. at 149.)

12

On October 3, 2002, Raite began receiving treatment from Dr. Sharon Springer, an internal medicine physician.  Over the next four years, Dr. Springer regularly treated Raite for sleep disturbance, urinary frequency, menopause, hyperlipidemia, hypertension, and a series of problems associated with her ears, sinuses, throat, and respiratory system, including otitis media, mild hearing loss, sinusitis, cough, post-nasal drainage, rhinitis, bronchitis, and bronchopneumonia.  (Tr. at 166-93.)  Dr. Springer otherwise reported that Raite's overall health— including physical, musculatory, neurological, genitourinary, and gastrointestinal—was good or normal.  (*Id.*)  During her first two meetings with Dr. Springer in October and November 2002, Raite denied having any fatigue.  (Tr. at 189, 192; *see also* Dr. Springer 2003 Notes, Tr. at 185-88  (containing no reference to fatigue or other MS-related symptoms).)  And while Dr. Springer regularly noted Raite's MS and the treatment she was receiving from Dr. Nitka and then Dr. Mihai, she did not report any symptoms, episodes, or relapses until August 2004.  (Tr. at 183.)  On May 20, 2005, Dr. Springer noted that Raite's MS was "stable at present" and that Raite was "able to function well but has daily fatigue."  (Tr. at 181.)  Thereafter, Dr. Springer noted "persistent fatigue," but that Raite was still "functioning well."  (Tr. at

13

166-67, 170, 176; *but see* Tr. at 173 (noting on December 21, 2005, "no more fatigue"); Tr. at 178 (noting on August 25, 2005, that Raite "never started amatidine [sic] for fatigue").)

Pursuant to her course of treatment, Dr. Springer submitted an evaluation of Raite's mental ability to do work-related activities. (Tr. at 222-24.) Although she noted Raite's relapsing-remitting MS, as well as lumbar disc disease, Dr. Springer opined that Raite's impairments would not in any way limit her (A) ability to understand, remember, and carry out all types of instructions; (B) ability to interact appropriately with supervisors, coworkers, or the public; or (C) ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 222.)

Based on the above medical evidence, particularly that which relates to the eligibility period, and Raite's own testimony regarding her abilities and daily activities, (Tr. at 239-63), the ALJ's well-documented decision to give limited weight to Dr. Mihai's opinion was both appropriate and supported by substantial evidence.[3]

---

[3] While Raite does not appear to challenge the ALJ's finding that her "statements concerning the intensity, persistence and limited effects of [her] symptoms are not entirely credible," (Tr. at 29), the court nonetheless concludes that this finding is supported by the relevant medical opinions, objective medical evidence, and Raite's incomplete, inconsistent, and imprecise testimony, (*see* Tr. at 254, 257-60, 263).

14

Furthermore, in assessing Raite's residual functional capacity (RFC), the ALJ's decision to give "some weight" to a disability analyst's assessment was entirely consistent with the regulatory requirements. (Tr. at 28.) The sheer fact that the ALJ's RFC assessment corresponds with the disability analyst's assessment, (*compare* Tr. at 26, *with* Tr. at 159-64), does not establish that the ALJ gave controlling weight to or otherwise impermissibly relied on the disability analyst's assessment. Rather, the consistency between the ALJ and the disability analyst's findings can be explained by the fact that they each had access to and relied on the same evidence, namely the opinions and treatment notes of Drs. Nitka, Schwid, and Mihai, and Raite's non-medical submissions. The ALJ determined that Raite had the RFC "to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk 2 hours in an 8-hour day, sit 6 hours in an 8-hour day, and push and/or pull without limitation ... [but] should avoid concentrated exposure to extreme heat." (Tr. at 26.) While this assessment is clearly, and appropriately, driven by the medical opinions rendered closely in time to the eligibility period, it is also clear that the assessment adequately accounts for the post-2003 medical and non-medical evidence. Thus, substantial evidence supports the ALJ's RFC

15

assessment. And since the ALJ's RFC assessment is supported by substantial evidence,[4] the court rejects Raite's argument regarding the ALJ's decision to credit the disability analyst's non-medical assessment.

Lastly, the court rejects as unfounded Raite's contention that the ALJ selectively cited to the record and ignored critical evidence. The ALJ's decision—which exhaustively catalogues the medical and non-medical evidence on record, including Dr. Mihai's findings and Raite's own testimony—refutes any suggestion of improper selectivity.

In summary, and after careful review of the record, the court finds that the ALJ's decision is supported by substantial evidence.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Raite's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

---

[4] Notably, aspects of the record medical opinions and Raite's testimony regarding the eligibility period could have supported a less conservative RFC assessment. (*See, e.g.*, Raite Test., Tr. at 243 (testifying to occasionally lifting 25 pounds).)

16

November 16, 2010
Albany, New York

_____
United States District Court Judge